GREENVILLE BUILDING AND LOAN ASSOCIATION

*v.*

ELLEN WHOLEY and husband.

[Decided December 1st, 1904.]

1. A mortgage was given to a loan association, to run ten years, to secure the amount of a loan, increased by adding thereto premiums on shares of stock subscribed for by the borrower and weekly dues on the stock for ten years, all to be paid in equal monthly installments, the mortgage providing that on failure to pay any of the installments when due all should at once become due and payable.—*Held*, that to foreclose such mortgage for the full amount for non-payment of an installment, without any rebate, as for unearned interest, premiums or dues, would be to enforce a penalty which cannot be done in equity.

2. On the foreclosure of such a mortgage for failure to pay an installment, there must be a rebate of the interest on such payments not bearing interest as are not yet due, calculated at the same rate used by the parties in fixing the amount of the mortgage.

---

On petition by defendant, after decree, execution and advertisement, to stay sale and open decree. Heard on *ex parte* affidavits.

*Mr. James R. Bowen,* for the petitioner.

*Mr. Robert S. Hudspeth,* for the complainant.

PITNEY, V. C.

The case of the petitioner, briefly stated, is this: In August or September, 1892, she borrowed and received from complainant, in actual cash, $2,350; complainant has since paid for her, in actual cash, for taxes, &c., $156.67; total received, $2,506.67. Petitioner has paid complainant, in monthly installments, $2,497.58, leaving unpaid $6.09.

On September 12th, 1903, the master reported that there was due the complainant a balance of $1,909.50—that is, petitioner has nearly repaid the whole amount actually received and still owes $1,909.50, nearly three-fourths of the original debt. Of these payments $1,747.79 were made between 1892 and 1898 (six years), in fifty-seven or fifty-eight monthly installments of $30.41$^2/_3$ each; and $750.79 was paid between 1898 and 1901, in about forty-one monthly payments of $18.42 each, so that the amount due on the loan, according to ordinary methods of calculation, should have been much reduced.

But at that time (1898) a sort of readjustment was made, by which the amount due was fixed at $1,700, minus $27.89, equaling $1,672.11, and a new mortgage, now under foreclosure, was given to secure this sum, payable in one hundred and forty-four monthly installments of $18.42 each.

Between 1898 and 1903, when the bill was filed, petitioner, as we have seen, paid $750.79 in about forty-one monthly installments, so that on any ordinary basis of calculating interest the debt of $1,700 should have been materially reduced. But instead of that we find a decree against her for $1,909.50, more than $200 greater than the debt at the date of the mortgage.

The result is such as to startle the mind of an ordinary business man, and to excite the attention of a chancellor.

This result, however, is attained by the use of the machinery adopted by the complainant in transacting its business of loaning money, and is sought to be justified by the act entitled "An act to encourage the establishment of mutual loan, homestead and building associations," approved April 9th, 1875 (*Gen. Stat. p. 331*), and the various supplements thereto and acts amendatory thereof.

The complainant was organized under that act as far back as 1875.

The object of the act is stated in the first paragraph, as follows:

"1. BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey*, That any number of persons, not less than five, may associate and form an incorporated company for the purpose of assisting each other, and all who may afterwards become associated with them, in acquiring real estate, making improvements thereon and removing incumbrances therefrom, by the payment of periodical installments; and for the further purpose of accumulating a fund to be returned to its members who do not obtain advances, for purposes above mentioned, when the funds of such association shall amount to a certain sum per share, to be specified in the articles of association."

Article 2 of the constitution of the complainant is as follows:

"The object of this association is, by co-operation, to enable its members to become their own landlords, by providing funds for each member to purchase real estate within twenty-five miles of the city of Jersey City, and in the State of New Jersey, and to make improvements thereon."

Acting under this legislative authority and in pursuance of that clause in its constitution, and to secure the debt of $1,700 above referred to, the complainant took from Mrs. Wholey, who is an ignorant and entirely illiterate woman and quite unfamiliar with any arithmetical processes, the bond and mortgage here in question, dated July 1st, 1898, and due July 1st, 1910, to be paid in monthly installments of $18.42 on the first of every succeeding month, one hundred and forty-four in number, with a clause providing that if default should be made in such payments for the space of thirty days, or if any taxes, assessments, water rents or other liens should remain unpaid for ninety days, then the whole amount of $2,652, or such part as shall remain unpaid, shall be at once due and payable.

The language of the mortgage corresponds.

There is no provision in either for the payment of fines, and the master has included in his report $9.29 for fines. There is no provision for the payment of interest.

The amount found due by him is computed in this wise:

Amount secured by mortgage.................... $2,652 00
Amount paid on account of monthly payments...  ·751 79

Balance due on principal...................... $1,900 21
Fines due..................................... 9 29

Total amount due.......................... $1,909 50

As has been before observed, this is more than $200 in excess of the original debt.

The sum of $2,652, mentioned in the bond, is shown by complainant's affidavits to be made up as follows:

Original debt (being amount advanced on three
    and two-fifths shares in the corporation).... $1,700 00
Premium, at $150 per share of $500............ 510 00
Dues, ten years, twenty-five cents per week, or
    $13 per year per share.................... 442 00

                             $2,652 00

The ascertainment of the precise rate of interest which the petitioner is compelled by her contract to pay, is rendered a little difficult by the method adopted of paying the aggregate of principal and interest in installments. I have attempted it, roughly, in this wise: Two thousand six hundred and fifty-two dollars, the amount secured by the mortgage, less $1,700, the debt at the date of the mortgage, leaves $952 as the amount paid for interest for twelve years, but as the payments are made in monthly installments and the principal is being constantly reduced until it is wholly paid, the transaction consists, in substance, of a loan of $1,700 for six years, so that the petitioner will pay $952 for the use of $1,700 for six years, which is $158.66²/₃ per year, a rate of nine and one-third per cent. per annum. But I shall take it at nine per cent.

Before proceeding to deal with and dispose of the case on that basis, I shall make two remarks—*first,* I am ready to hear any suggestions that counsel may make as to the correct mode of ascertaining the true rate of interest and to correct my mode if found to be inaccurate; *second,* I have hitherto gone and shall proceed on the basis that if the mortgage had been paid in

full in due course, or shall be paid in full by the sale of the mortgaged premises, petitioner will have no valuable interest in any shares of stock in the complainant corporation. I can find nothing in the terms of the bond and mortgage, or anything contained in any of the evidence submitted or in the argument of counsel, to suggest the contrary.

The complainant justifies the report of the master by that clause, or those clauses, of the statute above referred to, which, in effect, gives a special dispensation to companies organized under the above-mentioned act to charge more than the legal rate of interest.

But this dispensation must be so construed, in a court of equity at least, as not to result in manifest injustice, in the shape of oppression or extortion, or in the enforcement of a penalty.

I cannot believe that the legislature intended that a result, such as this case presents, should be justified by the act in question, for the reasoning of counsel for complainant goes to this extent: That if in one year or less, instead of five, after the giving of this mortgage, the petitioner had failed to pay an installment, it would have been entirely lawful and equitable for the complainant to have declared the mortgage forfeited and to have obtained from this court a decree for the whole $2,652, less one or two monthly payments of $18.42 each, or even none, if none had been paid.

Looking now at the master's report, we find that he has treated every one of the monthly payments maturing between the date of his report and the year 1910 as presently due, and has included them in his report without allowing any rebate thereon.

Now, I have always supposed that it was thoroughly settled, as well by the rules of equity as by the time-honored statute section 11 of *Chan. Pr.* (*Rev. of 1820 p. 706*); section 67 of *Chan. Pr.* (*Rev. of 1846 p. 919*); section 74 of *Chan. Pr.* (*Rev. of 1876*), and section 56 of the Revision of 1902, that where a mortgage is foreclosed for failure to pay an installment the master, in computing the amount due, must make a rebate of the interest on such payments, not bearing interest, as are not yet due. The language of the proviso is as follows:

"When the residue of the debt or demand intended to be secured by the said mortgage is payable at a future day without interest, and the mortgagee is willing to receive the same, the court shall deduct a rebate of legal interest for what the mortgagee shall receive on the said debt or demand, to be computed from the time of the actual payment thereof to the time such residue of the debt or demand would have become due and payable."

The words therein found "if the mortgagee shall be willing to accept the same," have never been construed to give him the option to claim the whole without rebate. The force of this language is that he need not have the principal sum not yet due included in his decree if he does not choose so to do.

To hold the contrary would be not only to nullify the statute's proviso, but would lead to oppression and injustice.

In this case only five years had elapsed at the date of the master's report, leaving seven years yet to come before maturity of the last payment, or an average of about three and one-half years on so much of the whole balance of $1,900 as became due after that date.

The result of the forfeiture, as we have seen, would have been the same if one year or less had elapsed, but much more oppressive and unjust in its results.

In answer to this complainant says that the contract provides in express terms that on failure to pay any one of the annual installments all shall at once become due, and hence the master's report is strictly correct.

To this petitioner replies, not only the considerations above mentioned, but that the enforcement of that part of the contract results in this court lending its aid to the enforcement of a penalty, which, it is hardly necessary to say, it will not do.

I think the position of the petitioner is sound, and I am glad to find that it is supported by authority. I refer to the case of *Tilley* v. *American Building and Loan Association, 52 Fed. Rep. 618,* in the United States circuit court for Arkansas, in particular at *pp. 625–627.*

In that case the mortgage was given to secure—*first,* the amount loaned, with interest; and *second,* a certain sum somewhat larger than the amount loaned, and which represented the

aggregate of the annual payments to be made by the borrower on account of the stock already subscribed for by him. The system of the building and loan association in that case was substantially the same as that in vogue here at the time our statute was passed. That plan was, as I think all the older members of the bar will recollect and as the reported cases show, to issue shares of stock for the amount of the loan; to make the loan for the amount of the stock, less the premium or "shave" which the borrower agreed to give, and to provide in the mortgage for the payment of the interest monthly on the whole sum borrowed, and also to secure like monthly payments on account of the stock subscribed for until the aggregate of such payments, with the profits, should make the stock worth the amount borrowed.

The scrip for the stock was actually issued to the borrower and assigned by him to the association as collateral. The result of this process was that payments on account of the shares, added to the profits due to the premium or "shave," were usually paid up in full some time before; in the ordinary course of things, the annual dues on the shares would equal their face value, and when that time arrived the value of the borrower's stock was equal to the principal of his loan; the debt was paid and the mortgage satisfied.

The true character of this transaction was clearly discerned and pointed out by Lord Cranworth, in *Fleming* v. *Self, 3 DeG. Macn. & G. 997 (July, 1854)*, and Chief-Justice Whelpley, in the case of *Franklin Building and Loan Association* v. *Marsh, 29 N. J. Law (5 Dutcher) 225*, an action of ejectment (at *p. 231*), after quoting the language of Lord Cranworth, adds: "It might have been further said that these associations are but organized societies of legalized usurers, and that by their operation the investments of the needy members are absorbed by the usury paid to those more able. The only advantage secured is enabling borrowers to repay a loan by monthly payments somewhat within their means. In all ordinary cases it is a most expensive way of obtaining a loan, and when obtained the borrower is utterly unable to tell what rate of interest he is to pay or how soon his debt will be extinguished."

Turning, now, to the Arkansas case just cited.

The borrower, shortly after the loan was made, desired to pay it off, and filed a bill to satisfy the mortgage upon equitable terms, and the mortgagee answered and claimed the whole amount covered by the mortgage, which was more than double the amount loaned. The court granted relief to the mortgagor upon paying the principal sum advanced, with interest, merely treating that part of the contract which provided for the payment of the aggregate of the annual dues for nine years as a penalty, or at least, under the circumstances, as so oppressive, if enforced, as to be obnoxious to the principles of equity.

I am unable to see how that conclusion is to be avoided when we consider that the payment of the amount of the dues for subscriptions to stock, by the fundamental idea of all these institutions, was expected, as we have seen, in the absence of anticipated losses, to result, in effect, in the payment of the principal.

It was on this basis, in the terminology adopted by the managers of these institutions, that the loan to a member was treated as an "advance" to him on account of his stock, and not a "loan," and the stock, in good time, on a division of the profits, was expected to repay that "advance."

For myself, I am unable to perceive how the present case (though different in form) differs in principle from that of an ordinary money bond, in which the obligor admits in the most solemn manner an indebtedness of, say, $2,000, and binds himself to its payment, and is to be relieved therefrom only on the payment of a smaller sum, say, $1,000, on a certain day.

This contract, with all its severity, was at first upheld at law and enforced in its precise terms, and the unfortunate obligors were obliged to come into equity for relief against it. Later, courts of law were compelled by statute to give equitable relief by confining the amount levied by execution to the amount actually due.

I conclude, then, that the master erred in not making this rebate on the deferred payments, and for this reason alone and to this extent the relief prayed for by the petitioner should be granted.

Petitioner, however, is not satisfied with relief to this extent. She avers that the mortgage was given for much more than she actually owed; that the amount for which she supposed she was giving it was made up by complainant's secretary in writing and given to her on a slip of paper, which she produces, as follows:

```
"To Liquidation .............................. $1,510 14
 "  Subscription & Book......................     5 30
 "  Old Tax & Assessment.....................   106 43
 "  Tax of /96 & /97.........................    40 24
 "  Water rent /98...........................    10 00
 "  Deposit Book ............................    27 89
                                              ──────────
                                              $1,700 00"
```

That she supposed that she was giving a mortgage for that amount.

The complainant's statement of the mode in which the $2,652 was made up has already been given.

Petitioner swears that she never understood that she was giving a mortgage for any such amount or any such items.

Complainant's secretary, on the contrary, swears that it was all fully explained to her and that she thoroughly understood it.

Petitioner, as we have seen, can neither read, write nor cipher, and in this transaction had no counsel or friend to assist her except her husband, who apparently is little, if any, more educated. She relied entirely upon complainant's secretary. Under these circumstances the burden is on the complainant to show that she did fully understand, in all its bearings, the contract into which she entered and the *rationale* of it, and the question is, did she understand why she was giving a mortgage for $2,652 to secure a debt of $1,700? Did she understand by what arithmetical processes monthly payments of $18.42 for twelve years were necessary to pay a debt of $1,700? Did she understand what rate of interest she would be paying for the money? The affidavit of complainant's secretary fails to satisfy me that she did.

But both parties went back to the original transaction of 1892. On that occasion petitioner borrowed of complainant

$2,350 and gave to secure it a mortgage to pay $3,650 in one hundred and twenty monthly installments of $30.41²/₃ each. This sum of $3,650 was made up as follows:

| | |
|---|---:|
| Sum advanced | $2,350 00 |
| Premium on same | 650 00 |
| Subscriptions to stock at twenty-five cents each per week | 650 00 |
| In all | $3,650 00 |

It would seem that the element of subscribing to shares of stock, as a part of the transaction, was here reduced to a minimum, for the shares were rated at $500 each, in order to enable her to obtain the loan of $2,350. In fact, she expected and thought that she had obtained a loan for $2,500, but the fact is that she received but $2,350.

Now, it will be observed that the weekly payments for ten years on account of stock, which seems to be the period for which the different series of stock ran, only amounted to $650 on five shares, or $130 per share. At that rate she would, of course, at the end of ten years, have paid only about one-third of the face of the stock, and, as before remarked, there was nothing in the affidavits submitted to indicate that any stock was ever issued to her, or that she, after the payment of all the installments, would ever become the actual owner of any stock, nor anything to indicate that if she had carried through that scheme and made all her payments to the end (ten years) she would have received any advantage or benefit whatever from her stock subscription.

I can perceive no office whatever which the apparent subscription to stock has in this transaction other than to make it conform in appearance merely, but not in substance, to the transactions, which, when the Building and Loan Association act was passed, were in vogue in New Jersey, as previously stated.

In the usual examination of petitioner's title, made before the giving of the first mortgage, complainant's searcher overlooked some arrears of taxes and an assessment which were liens on the mortgaged premises before petitioner purchased it, and

which were wholly unknown to her. These amounted to a little over $70. They accumulated, were dealt with under the Martin act and the premises were liable to a sale to pay more than double the amount of the original liens.

Petitioner was unable to meet this burden and censured the complainant for overlooking it when the search for the original loan was made. She subsequently found it difficult to make her monthly payments. In this condition of affairs, in 1898, when six of the ten years for the payment of the original loan provided for in the mortgage had expired, and the petitioner had paid $1,747.79 of the loan, a new arrangement was suggested by complainant's secretary and carried out, and the debt was liquidated thus:

| | | |
|---|---:|---:|
| Amount secured .......................... | | $3,650 00 |
| Fines ................................... | | 25 00 |
| Total .............................. | | $3,675 00 |
| Petitioner was credited with payments, | $1,747 79 | |
| Rebate on premium ($650, of which nearly one-half had been paid) ..... | 140 82 | |
| Allowance on subscription to stock ($650, of which nearly one-half had been paid) ....................... | 276 25 | |
| | | 2,164 86 |
| | | $1,510 14 |
| Taxes, &c.................................. | | 161 97 |
| | | $1,672 11 |
| Added to make up even sum................. | | 27 89 |
| Amount of mortgage...................... | | $1,700 00 |

For this amount the new mortgage was given, as above.

It will be observed that in ascertaining the amount due on the first mortgage, for the purposes of the new mortgage, allowance was made for the payments both on account of the premium and on account of the stock subscriptions, but no such allowances were made by the master in the computation of the amount due on the present mortgage.

The petitioner complains of this omission by the master. The complainant justifies it and relies on the act under which it was

incorporated, and says, and the secretary so swears, that the allowance so made in 1898 was a pure gratuity on the part of the complainant, which it was under no legal or equitable obligation to make. But I cannot adopt that view. The original debt was $2,350. On this petitioner had paid in actual cash $1,747.79, leaving due a balance, not counting interest, of $602.21.

Now, if the two items of allowance, $140.82 and $276.25, making, in all, $417.07, had not been made, the amount due on the mortgage, after running six years, according to complainant's interpretation, would have been $3,650, less payment of $1,747.79, leaving a balance of $1,902.21—that is, starting with a debt of $2,350, and paying thereon in monthly installments for nearly six years $1,747.79, we have remaining due, on complainant's theory, $1,902.21, a result entirely out of consonance with any notion of equity. It would have resulted, as already stated, to the enforcement of a penalty.

For reasons already stated, the petitioner would have been entitled to a rebate of interest, so that in equity, on a proper adjustment of the amount due, on the mortgage of 1892, the petitioner would have been entitled to a liberal abatement, and the only question is whether the amount actually allowed was in justice and equity sufficient.

For present purposes I shall consider it as sufficient, and shall take the amount ($1,672.11) agreed upon as due at the date of the mortgage here in question as the proper basis for the adjustment of the amount due on it at the date of the master's report.

In arriving at that amount I am of the opinion that a simple rebate of interest is not sufficient. I think the rebate should be at or near the rate which the loan has been carrying, viz., nine and one-third per cent. For safety, I shall consider it nine per cent.

I work out the problem thus: The $750.79 paid covered a fraction more than forty months and liquidated all dues up to November 1st, 1901; the balance due of $1,900 covered a fraction over one hundred and three months. Of those, twenty-

two months elapsed before September 1st, 1903, eleven days before the date of the master's report, so that on the day last named $405 was past due and $1,495 was yet to accrue. Now, the average time that those twenty-two monthly payments had been due was eleven months. I shall therefore add to the $405 interest thereon, at nine per cent. per annum, for the average time it had been running, to wit, for eleven months—that is, the principal sum is $405, interest $33.40. Now, I shall add thereto $1,495, less rebate thereon, at nine per cent. per annum, for half the time that the one hundred and three months, less twenty-two months—that is, eighty-one monthly payments, which compose it, accrued, to wit, forty-one and one-half months. To accomplish this I ascertain what sum of money, put at interest at nine per cent. per annum for forty and one-half months, will amount, with the interest, to $1,495. That sum is $1,146.67.

Now, to this sum of $1,146.67 add the $405 and the interest thereon, $33.40; the result is $1,584.07 as the amount due September 1st, 1903. Add to this interest to September 12th, eleven days, at nine per centum ($4.35), we have $1,588.42.

This result is subject to a possible error of a few dollars in small fractions of time and sums which I have not taken into account. It takes no account of fines, which, I think, should not be included.

I find another source of possible error in the master's report, which I shall mention here. An examination of the petitioner's pass-book, in which the entries of the payments aggregating $750.79 are made, shows that the sum of $27.89, added to the debt of $1,672.11 of July 1st, 1898, to make up the $1,700, was not included in the $750.79; and it further shows that those actual payments amounted to $780.30, and that $36.51 was deducted therefrom for three items, the purport of which I cannot make out. No mention is made of these items by counsel.

The result is that instead of finding her debt increased $200 in five years, notwithstanding a payment of $750.79, the debt is reduced $111.56, which certainly is more in consonance with equitable ideas than the other.

Another way to look at it is this: The legal interest on $1,700

for five years and two months is $527; the petitioner has paid $750.79, or $223.79 more than the legal interest, and out of this $223.79 she has paid on account of principal of her debt $111.56, and the balance is for excess of legal interest.

I am aware that the statute requiring a rebate of interest in such cases provides for a rebate of "legal" interest, which ordinarily would be six per cent., but I have already remarked that the rebate of interest is strictly an equitable right, independent of the statute. Further, I think that the statute in this court should have an equitable construction; thus, if the rate of interest used by the parties in fixing the amount due on a mortgage payable in installments without interest was originally four per centum, it would be inequitable in case the mortgagee were compelled to foreclose the mortgage to be compelled to accept—and he is, in substance, so compelled—the principal, with a rebate of six per cent. So here, where the deferred payments were made up on a basis of nine per cent., it is unjust to the mortgagor to be given a rebate of only six per cent. In other words, it is within the equity of the statute to give a rebate at the rate which the mortgagee has declared has been rendered *legal* by the statute under which it is organized. For present purposes nine per cent. must be held to be *legal* interest, according to the language of the statute.

This result renders it unnecessary to deal with another argument advanced by counsel for petitioner, based on the admitted fact that in the case here in hand the new loan of $1,700 was not in fact put up at auction, and the amount of premium charged petitioner was arrived at by striking an average of the prices at which loans were being struck off.

His argument is that by the language and spirit of the act, and by the constitution of complainant, all loans must be put up at auction.

I shall only add that I have carefully gone through all the authorities cited by counsel of complainant in support of the master's report and find nothing in any of them inconsistent with the conclusions at which I have arrived. Counsel referred me to *dicta* of judges of this court declaring that where a mort-

gage, given under the old plan, already mentioned, which covered not only the principal sum loaned, with interest thereon, but also the annual dues on stock subscriptions, in case of foreclosure in default of payment, the proper mode of computing the amount due was to include all such dues up to the date of the winding up of the then present series of the association. The difficulty with this doctrine is, and in practice was found to be, that there was usually no specific time fixed, or capable of being fixed, when all the dues would become payable. I think an examination of the adjudged cases will show this. The language above quoted from the opinion of Chief-Justice Whelpley, in the case in *29 N. J. Law (5 Dutch.) 231,* is significant.

But if we can imagine a decree in one of the old-fashioned cases, of which the Arkansas case was a sample, for the whole amount of the original debt, with interest to date, and for the aggregate of the monthly dues for stock subscriptions, and the amount of the decree should be collected by a sale of the mortgaged premises, we should have this strange result, viz., the borrower would be compelled to pay to the association, not only the original amount loaned, but also, in advance, the whole of the fund which by the scheme of the association was intended to pay that debt; and when the stock subscribed should have arrived at par value the holder of the stock would be entitled to an immediate division of assets, on the score of the whole affair amounting to a partnership, and would get back the value of his stock in money.

In other words, the court would decree the borrower's land to be sold to raise money, which the moment it was received by the complainant would in equity become the borrower's money. I think the Arkansas case, above cited, might have been put upon that ground.

The leading case in New Jersey, where this matter has been dealt with in practice, is *Mechanics' Building and Loan Association* v. *Conover et al., 14 N. J. Eq. (1 McCart.) 219,* decided by Chancellor Green. The decree in that case was appealed, and the decree made by him was modified in a matter but faintly mooted before him, but his disposition of the question arising out of the building loan laws was expressly affirmed.

The bill was filed by the association to foreclose a mortgage, given to it under the old plan, which had run for four years, and a considerable sum of money had been paid on the stock subscriptions.

The dispute was between a subsequent mortgagee and judgment creditors who had levied on the shares of stock. It was claimed by the second mortgagee that the payments for four years on account of the stock subscriptions should be applied to the reduction of the first mortgage. This was contested by the judgment creditors, who wished to have the privilege of selling that stock. The chancellor, after stating very clearly the plan on which the association was acting, and the practical workings thereof, declared that the second mortgagee was not entitled to have the amount so applied, or any other amount, until the association had been long enough in operation to make the value of the stock equal to the debt, which time was uncertain. This part of the decree and the reasoning thereon was affirmed by the court of errors and appeals. But the chancellor further held that the judgment creditors had a right to sell the stock, which seemed to have a marketable value, and take the proceeds and apply them on their judgments.

This part of the decree was reversed by the court of errors and appeals and it was held that the second mortgagee had the superior equity to have the value of the shares, as contradistinguished from the actual amount paid in on account of them, applied in reduction of the first mortgage.

This principle was applied by Chancellor Runyon, in the case of *Red Bank Mutual Building and Loan Association* v. *Paterson, 27 N. J. Eq. (12 C. E. Gr.) 223,* a case much like Chancellor Green's case, and the association was compelled to sell at auction the stock which they held as collateral security, and apply the proceeds in reduction of the amount due on their mortgage before having recourse to the mortgaged premises.

This case was followed by Vice-Chancellor Grey in the very recent case of *Hoagland* v. *Saul, 53 Atl. Rep. 704.*

This mode seems to me much more equitable than the one suggested of including in the decree the whole amount of monthly dues not yet due.

But all this learning seems to me to have little application to the present case, where, as before observed, the existence of the stock is apparently a mere shell, and the subscriptions to it, and the bonus for the loan, and the interest thereon, are all mingled together and the amount divided up into installments without interest, on the payment of the last one of which the mortgage debt is paid without regard to the value of the shares and the borrower's interest in the association ceases. Such is the construction which I put upon the elaborate and complicated system contained in complainant's constitution.

I shall advise an order that the amount due at the date of the master's decree be reduced to the sum of $1,588.44 and that the sheriff be directed to levy that amount, with costs and interest, and that he shall give petitioner credit for the costs of her petition herein. The figures above mentioned are subject to be corrected by any suggestion which counsel on either side have to make.

Petitioner claims that the mortgage of 1892 remains unsatisfied of record. This must be corrected and the mortgage either be satisfied or tendered to the purchaser for satisfaction at the sale.